IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UPMC ST. MARGARET HOSPITAL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1237 |
| | ) | Judge McVerry |
| MICHAEL O. LEAVITT, as the Secretary | ) | Magistrate Judge Mitchell |
| of the United States Department of Health | ) | |
| and Human Services, | ) | |
| Defendant. | ) | |


REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant (Docket No. 24) be granted.

II.     Report

Plaintiff, UPMC St. Margaret Hospital ("UPMC St. Margaret"), brings this action

pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 551-59 (APA), and the applicable

provisions of the Medicare Act and regulations, 42 U.S.C. § 1395$oo$f(1), 42 C.F.R. § 405.1877,

seeking review of the final decision of the Defendant, Michael O. Leavitt, Secretary of Health

and Human Services ("Secretary"), denying its Medicare reimbursement claim for depreciation-

related losses that allegedly occurred during the statutory merger that created UPMC St. Margaret

effective March 1, 1997.

Presently before this Court for disposition is a motion for summary judgment, brought by

the Defendant.  For the reasons that follow, the motion should be granted.

Facts

Prior to the merger, St. Margaret Memorial Hospital ("SMMH") was a non-profit corporation operating an acute care inpatient hospital of the same name and its parent company, St. Margaret Health System, Inc. ("SMHS"), was a Pennsylvania non-profit corporation. The University of Pittsburgh Medical Center System (UPMCS) was and is a Pennsylvania nonprofit corporation situate in Allegheny County, Pennsylvania and the parent and corporate member of a major academic medical center and integrated health care system headquartered in the City of Pittsburgh. (Administrative Record ("A.R.") 121.)[1]

On November 4, 1996, the officers of SMMH, SMHS and UPMCS signed a letter described in its paragraph 16 as a non-binding Letter of Intent that outlined a process of proposed integration of St. Margaret Hospital into UPMCS. On January 10, 1997, a Pennsylvania nonprofit corporation named University of Pittsburgh Medical Center, St. Margaret was incorporated, but was not operational until March 1, 1997. UPMCS was the sole corporate member (i.e. the equivalent of sole shareholder in a stock corporation) of UPMC St. Margaret. The only incorporator was an officer of St. Margaret Hospital. (A.R. 21, 107-08, 121-22, 267.)

On February 3, 1997, SMMH and UPMCS signed an agreement to merge SMMH and SMHS into UPMC St. Margaret, with UPMC St. Margaret as the surviving corporation. (A.R. 122, 907-64.[2]) According to the terms of the Merger Agreement, the board of directors of UPMC St. Margaret would consist of ten members appointed by SMMH and six members appointed by UPMCS. (A.R. 947.) The Merger Agreement created an "integration period" of five years

---

[1]    Docket No. 8.

[2]    Docket No. 10.

during which UPMCS would be unable to: (1) change the corporate structure of UPMC St. Margaret; (2) sell or transfer all or substantially all of UPMC St. Margaret's assets; (3) cease operating UPMC St. Margaret as a licenced acute care hospital; (4) add, subtract or modify any significant service provided by UPMC St. Margaret; (5) merge or combine UPMC St. Margaret's medical staff with that of another hospital operated by UPMCS; (6) amend the articles of incorporation or bylaws of UPMC St. Margaret; or (7) modify the UPMC St. Margaret board of directors without the vote of 12 of UPMC St. Margaret's 16 directors. (A.R. 948-49.) Additionally the President, three Vice Presidents, and the Controller of SMMH were to retain these same positions in UPMC St. Margaret. (A.R. 23.)

In accordance with the Merger Agreement, SMMH transferred both its assets and its liabilities to UPMC St. Margaret. Prior to executing the Merger Agreement, SMMH did not conduct any appraisal to determine the fair market value of the assets being transferred. (A.R. 24.) An appraisal subsequently was conducted to determine the assets' fair market value for purposes of allocating consideration and calculating SMMH's loss. (A.R. 998-1000.) According to this appraisal, UPMC St. Margaret sold approximately $130 million worth of assets – including monetary and financial assets in excess of $86 million – for the assumption of $71.6 million in debt. The appraisal indicates that the value of its non-current assets (including land, buildings, equipment, construction, and intangibles) was approximately $37 million. (A.R. 999.) Thus, according to SMMH's balance sheet, SMMH transferred assets valued at $129,279,579 in return for UPMC St. Margaret assuming liabilities in the amount of $71,564,726. (Id.)

At all times prior to February 28, 2007, St. Margaret Hospital and UPMC had no

common board members and officers and had no common ownership interest in each other. Although UPMC St. Margaret was incorporated on January 10, 1997, its officers and directors did not take their positions or exercise corporate governance power until February 28, 1997. SMMH, prior to February 28, 1997, was an approved provider participating in the Medicare and Medicaid programs and was in compliance with the conditions of participation in those programs and the provider contracts with those programs. UPMC St. Margaret became a Medicare provider on February 28, 1997 pursuant to procedures and notices required by 42 C.F.R. § 489.18(c).

Following the closing, UPMC St. Margaret succeeded by operation of law to and assumed all rights and obligations of SMHS and SMMH under the Non-Profit Corporation Law of Pennsylvania.. 15 Pa. C.S. § 5929. SMHS and SMMH ceased to exist as of the merger date. The assets, liabilities, reserves and accounts of each of SMHS were taken upon the books of SMMH immediately prior to the closing, subject to any adjustments which were required in accordance with generally accepted accounting principles giving effect to the merger date of February 28, 1997. All actions taken pursuant to the Merger Agreement were done pursuant to Pennsylvania law. (A.R. 123-24, 1037.)

Following the merger, UPMC St. Margaret filed a "terminating" cost report with the Medicare program for its fiscal year that ended on February 28, 1997. In this report, UPMC claimed a loss resulting from the merger and sought additional depreciation payments for fiscal year 1997 and earlier years totaling $13,244,230.[3] UPMC St. Margaret asked Medicare to

_____

[3]     This amount was later recalculated by Plaintiff's witness, Robert DeLuca, in the amount of $13,093,806, which was the amount recognized by the Board as a reimbursable loss. The

(continued...)

reimburse its share of that loss through a depreciation adjustment pursuant to Medicare

regulations.  42 C.F.R. § 413.134(f).  (A.R. 297-301; see also A.R. 103.)

Upon reviewing UPMC St. Margaret's cost report, the Centers for Medicare & Medicaid

Services ("CMS"), acting through its fiscal intermediary, Veritus Medicare Services

("Intermediary"), audited the closing cost report and, on September 22, 1999, issued a Notice of

Program Reimbursement that disallowed the claimed loss in full.  (A.R. 329-32.)  UPMC St.

Margaret appealed the Intermediary's decision to the Provider Reimbursement Review Board

("the Board"), as prescribed by the Medicare statute.  42 U.S.C. § 1395$oo$(a).  On June 6, 2005,

the Board held an evidentiary hearing, at which Plaintiff submitted testimony from UPMCS

general counsel George Huber and health care financing consultant Robert DeLuca.  Plaintiff

also submitted an affidavit by Michael Maher, former Director of the Office of Reimbursement

Policy of the Bureau of Health Insurance (a predecessor to CMS).  The Intermediary presented no

evidence other than its initial denial and its position papers.  (A.R. 117-20, 249-310.)

On May 26, 2006, the Board issued a decision in the hospital's favor.  The Board

concluded that the regulation on gains and losses resulting from mergers was clear and that, with

respect to related organizations, the only issue was whether the parties were related at the time of

the merger.  The Board also relied on CMS's long-standing interpretive guidelines, which state in

part that "Medicare program policy permits a revaluation of assets affected by corporate mergers

between unrelated parties."  Finally, the Board concluded that because there was a specific

regulations that controlled the recognition of loss at issue, the "merger is not required to meet

---

[3]      (...continued)
Intermediary introduced no evidence contradicting or refuting this revaluation.  (A.R. 53-54, 293-302.)

bona fides of sales transactions addressed in 42 C.F.R. § 413.134(f)(2)." (A.R. 46-54.)

The CMS Administrator, on behalf of the Secretary and in accordance with the Medicare statute and regulations, reviewed the case. 42 U.S.C. § 1395*oo*(f)(1); 42 C.F.R. § 405.1875(a). On July 25, 2006, the Administrator issued a decision reversing the Board's decision and affirming the Intermediary's disallowance of the loss. The Administrator found that the discrepancy between the value of the transferred assets and the consideration received for them indicated the absence of a bona fide sale. The Administrator further concluded that SMMH's significant participation in the governance of UPMC St. Margaret (the appointment of the majority of UPMC St. Margaret's board of directors) rendered them "related parties," thereby disallowing the use of the "sale price" as the fair market value of the hospital. (A.R. 2-25.) The Administrator's decision became the final decision of the Secretary. UPMC St. Margaret subsequently filed this appeal.

Procedural History

Plaintiff filed this action on September 15, 2006. On January 16 and 17, 2007, Defendant filed, respectively, an answer to the complaint (Docket No. 6) and a certified copy of the transcript of the administrative record of the proceedings in this case (Docket Nos. 8-10). On September 17, 2007, Defendant filed a motion for summary judgment.

Standards of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Under the Social Security Act, judicial review of a final administrative decision is governed by the APA, which provides for judicial review of agency decisions and is limited to "a determination of whether the agency action, findings and conclusions are arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law or unsupported by the evidence." 5 U.S.C. § 706(2)(A). The agency's decision must be supported by "substantial evidence," which is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436 F.3d 370, 380 (3d Cir. 2006) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

With respect to Medicare regulations, the Supreme Court has held that courts:

> must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain

language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991).

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (other citations omitted).

Overview of the Regulations

Under the Medicare Act, the Secretary reimburses hospitals for the reasonable cost of providing covered health care services to Medicare patients. 42 U.S.C. § 1395f(b)(2). Reasonable cost means "the cost actually incurred," excluding anything unnecessary for the efficient delivery of needed health services, and determined in accordance with the Secretary's regulations. 42 U.S.C. § 1395x(v)(1)(A).

The Secretary has promulgated extensive regulations for determining reasonable cost reimbursement. Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 92 (1995). Among other things, an appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost. 42 C.F.R. § 413.134(a) (1995).[4] The portion of such depreciation expense borne by Medicare is based in part on the degree to which the assets have been used to serve Medicare beneficiaries.

Fair market value "is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the

---

[4] In 1997, Congress amended section 1861 of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(O)(i), by setting the asset's value equal to the owner's historical cost less depreciation allowed, thereby eliminating the possibility of gains or losses resulting from asset disposals after August 5, 1997. However, this amendment did not effect the merger in this case, which had an effective date of March 1, 1997.

price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition." 42 C.F.R. § 413.134(b)(2). See also Provider Reimbursement Manual ("PRM"), Ch. 1, § 104.15 (A.R. 889).

The system of providing reimbursement for depreciable assets results in those assets having a "net book value" for Medicare purposes, which is typically the historical cost of the asset less depreciation previously paid to the provider. See 42 C.F.R. § 413.134(b)(9). Under the Secretary's regulations, when a hospital disposes of a depreciable asset for more or less than its net book value, "an adjustment is necessary in the provider's allowable cost ." § 413.134(f). For example, when an asset is sold for more than book value, the provider is considered to have incurred a gain on the asset, and the Secretary can "recapture" from this gain depreciation payments previously made. Conversely, if the provider sells the asset for less than book value, the provider is considered to have incurred a loss, and the Secretary provides additional reimbursement to the provider. See 44 Fed. Reg. 3980 (1979) ("[I]f a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care."); 42 U.S.C. § 1395x(v)(1)(A) (1995) (the Secretary shall provide for suitable retroactive corrective adjustments where the aggregate reimbursement produced by methods of determining costs proves to be either inadequate or excessive).

The primary regulation at issue here is 42 C.F.R. § 413.134 (1995), concerning "allowance for depreciation based on asset costs." A subsection of the regulation dealing specifically with gains and losses upon disposal of depreciable assets provided in part that "depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition,

abandonment, condemnation, fire, theft or other casualty." § 413.134(f)(1).  If such disposal

resulted in a gain or loss, "an adjustment is necessary in the provider's allowable cost."  The

treatment of the gain or loss "depends upon the manner of the disposition of the asset, as

specified in paragraphs (f)(2) through (6) of this section."  Subsection (f)(2), entitled "Bona fide

sale or scrapping," provided in part that gains and losses realized from "the bona fide sale" of

depreciable assets were included in allowable costs while the provider is participating in

Medicare.

 The provision at the heart of the current dispute, § 413.134(*l*), was entitled "Transactions

involving a provider's capital stock."[5]  It addressed three particular types of transactions: (1) the

acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation.  The

second subsection, on statutory mergers, noted that a merger was a combination of two or more

corporations, with one of the corporations surviving and acquiring the assets and liabilities of the

merged corporation by operation of law.  § 413.134(*l*)(2).  This subsection drew a distinction as

to mergers between unrelated parties and those between related parties.  If the parties to the

merger were unrelated (as defined in § 413.17), the assets of the merged corporation acquired by

the surviving corporation "may be revalued in accordance with paragraph (g) of this section," and

"[i]f the merged corporation was a provider before the merger, then it is subject to the provisions

of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and

the realization of gains and losses.  The basis of the assets owned by the surviving corporation

are unaffected by the transaction." § 413.134(*l*)(2)(I).

 Section 413.17, referenced in subsection (*l*) above, was entitled "Cost to related

---

[5] 42 C.F.R. § 413.134(*l*) was redesignated as 42 C.F.R. § 413.134(k) in 2002.

organizations."  It provided generally that "costs applicable to services, facilities, and supplies

furnished to the provider by organizations related to the provider by common ownership or

control are includable in the allowable cost of the provider at the cost to the related

organization," but are not to exceed the price of comparable such items that could be purchased

elsewhere.  42 C.F.R. § 413.17(a).  It also defined "related to the provider" to mean "that the

provider to a significant extent is associated or affiliated with or has control of or is controlled by

the organization furnishing the services, facilities, or supplies."  § 413.17(b)(1).  Further,

"common ownership exists if an individual or individuals possess significant ownership or equity

in the provider and the institution or organization serving the provider," and "control exists if an

individual or an organization has the power, directly or indirectly, significantly to influence or

direct the actions or policies of an organization or institution."  § 413.17(b)(2) & (b)(3).

>   The Provider Reimbursement Manual states as follows:

>   The term "control" includes any kind of control, whether or not it is legally
>   enforceable and however it is exercisable or exercised.  It is the reality of the
>   control that is decisive, not its form or the mode of its existence.

>   The facts and circumstances in each case must be examined to ascertain whether
>   legal or effective control does, in fact, exist.  Since a determination reached in a
>   specific case represents a conclusion based on the entire body of facts and
>   circumstances involved, such a determination should not be used as a precedent in
>   other cases unless the facts and circumstances are substantially the same.

PRM, Ch. 10,  § 1004.3.[6]

<u>Plaintiff's Arguments</u>

>   Plaintiff argues that: 1) the Administrator's interpretation of the term "between related

corporations" in the regulation relating to gains and losses from mergers as potentially referring

---

[6]     1995 WL 17211990.

to the pre-merger and post-merger entities is inconsistent with the unambiguous language of the regulation, which can only refer to the parties to the merger and cannot include the corporation that results therefrom, and thus the Administrator's interpretation is not entitled to any deference; 2) the Administrator's new policy represents a fundamental change in CMS's previous interpretation of the regulations, and such change can only be implemented after satisfaction of the notice and comment requirements of the APA, 5 U.S.C. § 553 (which did not occur), and the Administrator cannot rely on an unpublished policy to the detriment of providers who are unaware of it; 3) no substantial evidence exists in the record to support the Administrator's conclusion that SMMH and UPMC St. Margaret are "related parties" and conversely substantial evidence demonstrates that this is not the case; and 4) the Administrator erred in concluding that the transaction was not a bona fide sale because Medicare does not require cash as consideration and does not require that fair market value be paid.

Related Parties

As explained above, Medicare regulations provide that:

Statutory merger. A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:

(I) Statutory merger between unrelated parties. If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. The basis of the assets owned by the surviving corporation are unaffected by the transaction. An example of this type of transaction is one in which Corporation A, a nonprovider, and Corporation B, the provider, are combined by a statutory merger, with Corporation A being the

surviving corporation.  In such a case the assets of Corporation B acquired by
Corporation A may be revalued in accordance with paragraph (g) of this section.

(ii) Statutory merger between related parties.  If the statutory merger is between
two or more related corporations (as specified in § 413.17), no revaluation of
assets is permitted for those assets acquired by the surviving corporation.  An
example of this type of transaction is one in which Corporation A purchase the
capital stock of Corporation B, the provider.  Immediately after the acquisition of
the capital stock of Corporation B, there is a statutory merger of Corporation B
and Corporation A, with Corporation A being the surviving corporation.  Under
these circumstances, at the time of the merger the transaction is one between
related parties and is not a basis for revaluation of the provider's assets.

42 C.F.R. § 413.134(*l*)(2) (1995).

On October 19, 2000, CMS issued Program Memorandum ("PM") A-00-76 to its

contractors, which addresses the issue of the recognition and reimbursement of depreciation-

related losses on the sale of assets.  The PM states that, because nonprofit entities have different

motivations than for-profit entities, special considerations have to be regarded in applying the

regulations to nonprofit mergers.  Specifically, the PM focuses on whether members of the pre-

merger hospital board of directors and management team continued in office after the merger,

and it interprets the related organizations regulation as requiring:

Consideration ... to whether the composition of the new board of directors, or
other governing body or management team, includes significant representation
from the previous board(s) or management team(s).  If that is the case, no real
change of control of the assets has occurred and no gain or loss may be recognized
as a result of the transaction.

(A.R. 988.)

It further provides that:

[W]hether the constituent corporations in a merger or consolidation are or are not
related is irrelevant; rather, the focus of the inquiry should be whether significant
ownership or control exists between a corporation that transfers assets and the
corporation that receives them.  The term "significant" as used in this PM has the
same meaning as the terms "significant" or "significantly" in the regulations at 42

13

CFR 413.17 and the PRM at Chapter 10. Important considerations in this regard include that 1) the determination of common control is subjective (i.e., there is no objective measure or "rule of thumb" in establishing common control), 2) each situation stands on its own merits based on the facts and circumstances unique to that situation, 3) a finding of common control does not require 50 percent or more representation, and 4) there is no need to look "behind the numbers" to see if control is actually being exercised, rather the mere potential to control is sufficient.

(Id.)

Plaintiff argues that the regulation unambiguously stated the conditions required to demonstrate a statutory merger between unrelated parties, using the present tense, and therefore the Administrator's conclusion that "between related corporations" can refer to pre-merger and post-merger entities is inconsistent with the regulation and not entitled to any deference.

However, the courts that have addressed this argument have rejected it:

> the agency's present construction does not actually contradict the plain language of any applicable regulation. Although the Secretary's position may not employ the most plausible reading of [the] subsection, nothing in that regulation–or any other for that matter–expressly precludes the Secretary's interpretation. At the same time, the Secretary's construction has some express support in the related party rule of § 413.17 and in the gain/loss provisions of § 413.134(f), both of which the Secretary has now effectively construed as setting forth additional requirements for recognition of gain or loss above and beyond the requirements of [the] subsection. It cannot be disputed that the agency has long had a policy limiting reimbursement for costs incurred through a related provider, and that it has considered parties to be related if one controls or influences the other "even though it is a separate legal entity." § 413.17(c)(2). See also HCFA Ruling 80-4 ("[a]pplicability of the related organization rule which limits costs of a provider to those of its supplier is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although this factor is to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract."). No showing has been made that the Secretary's interpretation as to how these regulatory provisions interact with each other is contrary to any established rule or law.

Via Christi Regional Med. Ctr. v. Leavitt, 2006 WL 2773006, at *14 (D. Kan. Sep. 25, 2006)

(citations omitted).  See also Jeanes Hosp. v. Leavitt, 453 F. Supp. 2d 888, 899 (E.D. Pa. 2006) ("While the plain meaning of § 413.134, if read in a vacuum, may seemingly limit the related-party analysis to the transacting parties, in fact, § 413.17 is incorporated with, and must be read in conjunction with, § 413.134.  Thus, the Court finds the Administrator's interpretation of the regulation reasonable.")

Plaintiff has not pointed to any authority in support of its argument.  Thus, the Secretary's interpretation is entitled to deference and the phrase "between related corporations" can refer to pre-merger and post-merger entities.

Notice and Comment Rulemaking

Plaintiff argues that, even if CMS's new interpretation of the regulations on mergers and related organizations were a permissible reading of the language of the regulations, such a change could only be adopted through notice and comment rulemaking because it is a fundamental change from how CMS previously interpreted and implemented the regulations.  It points to Michael Maher's testimony that, based on his experience, the organization of the post-merger entity was not relevant to the determination of whether the parties were unrelated prior to the transaction.  (Maher Aff. ¶¶ 7-8.)[7]

If an agency has previously adopted an interpretation of a regulation, it may not fundamentally change that interpretation without using the notice and comment procedures established by the APA, 5 U.S.C. § 553.  The Court of Appeals has held that, "if an agency's present interpretation of a regulation is a fundamental modification of a previous interpretation, the modification can only be made in accordance with the notice and comment requirements of

_____

[7]        A.R. 118.

15

the APA."  SBC Inc. v. FCC, 414 F.3d 486, 498 (3d Cir. 2005).

However, the court went on to note that interpretive rules "seek only to interpret language already in properly issued regulations," that "an interpretive rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties," and that "interpretive or procedural rules and statements of policy are exempted from the notice and comment requirement of the APA."  Id. (citations omitted).  See also Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 99-100 (1995) (interpretive rules do not require notice and comment under the APA).

Regarding this specific Program Memorandum, courts have held that:

PM A-00-76 states that, since the memorandum "does not include any new policies regarding mergers or consolidations involving non-profit entities," there is no "effective date," and it is to be applied to "all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening."  PM A-00-76 does not introduce a new rule, rather it clarifies how to evaluate whether a bona fide sale has occurred in the non-profit context.  Since non-profit organizations are often driven by the interests of the community at large, rather than a desire to obtain the highest price for their assets, it can be difficult to determine whether a bona fide sale has occurred. Therefore, guidance was needed.  Since PM A-00-76 merely provides clarification, the [Board]'s reliance on PM A-00-76 does not constitute "retroactive rulemaking."

Lehigh Valley Hospital-Muhlenberg v. Leavitt, 2006 WL 2547061, at *4 (E.D. Pa. Aug. 31, 2006).  See also Via Christi, 2006 WL 2773006, at *15; Jeanes Hosp., 453 F. Supp. 2d at 899.

Plaintiff does not address these cases and it cites no authority to the contrary.  Thus, the Secretary was not required to comply with the notice and comment provisions of the APA prior to relying upon PM a-00-76 and its clarification of this issue.

Unpublished Policy

Plaintiff argues that, even if CMS was not required to engage in the notice and comment

procedures of the APA, it was required to make its new policy public before parties like UPMC

St. Margaret relied on a previous interpretation to their detriment. The APA provides that:

> Except to the extent that a person has actual and timely notice of the terms
> thereof, a person may not in any manner be required to resort to, or be adversely
> affected by, a matter required to be published in the Federal Register and not so
> published.

5 U.S.C. § 552(a)(1). See NI Industries, Inc. v. United States, 841 F.2d 1104, 1107-08 (Fed. Cir.

1988).

However, Plaintiff has not demonstrated that the clarification provided by the Program

Memorandum was a "matter required to be published in the Federal Register." This argument

appears to be a re-casting of the previous one and, for the reasons explained above, should be

rejected.

Substantial Evidence Regarding Control

Plaintiff argues that there is no substantial evidence that the carryover directors and

management could significantly direct or control UPMC St. Margaret and that, conversely, there

is substantial evidence in the record that they lacked such control, that real change of control

occurred. Defendant responds that the Merger Agreement conclusively shows that the Board did

in fact control UPMC St. Margaret and had primary responsibility for its actual operation.

Defendant points to the following provision of the agreement: "During the Integration

Period, UPMC St. Margaret will be governed by a self-perpetuating board of 16 directors..."

(Merger Agmt. § 10.3(a));[8] "During the Integration Period, it shall be the responsibility of the

UPMC St. Margaret Board to govern the operation of UPMC St. Margaret..." (Id. § 10.3(b));

---

[8]        A.R. 947.

"During the Integration Period, the ten St. Margaret Designated Directors of the UPMC St. Margaret Board shall have the exclusive authority to appoint and discharge the Senior Management of UPMC St. Margaret..." (Id. § 10.3(d));[9] "During the Integration Period, appointments, reappointments, denials (and disciplinary actions) relating to the medical staff of UPMC St. Margaret shall be determined by a majority of the directors in office (i.e., 9 of 16) of the UPMC St. Margaret Board" (Id. § 10.3(g)).[10]

The Administrator concluded that:

there was continuity of control that resulted in the parties to the merger being related. Prior to the merger there was evidence that SMHS/SMMH was related to the surviving corporation UPMC St. Margaret since the sole person that incorporated the surviving corporation was an officer of SMMH. In addition, SMMH's board had consisted of 12 members. After the merger, UPMC St. Margaret's hospital board consisted of 8 out of the original 12 members of SMMH and SMHS plus 6 new members representing UPMCS. Pursuant to the [agreement], the new structure of the governing board would consist of a total of 16 members, ten from the SMMH and SMHS board and six from UPMCS. The representation of significant number of the Providers's former board members on the board of the surviving corporation shows that the Provider continued to exert influence and control in the surviving corporation and over the transferred assets. Notably the only entities with assets that merged into UPMC St. Margaret SMMH/SMHS and it is those assets SMMH/SMHS continued to control as shown in its former board members significant and continuing representation on the surviving corporation's board. In addition, the merger agreement called for a five-year transition period during which time SMMH/SMHS retained significant powers on the board of directors of UPMC St. Margaret.

The record also shows that a significant number of high level executives/officers of SMMH/SMHS were similarly positioned in the surviving entity. The record shows that the President, three Vice Presidents and the Controller of SMMH remained in these same positions in the surviving corporation. All of the foregoing demonstrates that there was a continuity of control in the surviving corporation by former members of the SMMH and SMHS board and officers over

---

[9]     A.R. 949.

[10]    A.R. 950.

18

the transferred assets after the merger with UPMC St. Margaret.

(A.R. 23-24.)

In Via Christi, the court held that the Secretary's conclusion that the resulting entity (Via Christi) was significantly controlled by St. Joseph (its predecessor in interest) was supported by substantial evidence: seven of the twenty-three board members came from St. Joseph and although their control was less after the consolidation than before they still possessed the power to at least indirectly influence the actions or policies of Via Christi; a number of significant operational positions were filled with former St. Joseph members (including the president and CEO); and the Sisters of St. Joseph (one of only two members of the post-consolidation parent and the sole member of the pre-consolidation entity) maintained a significant ability to influence or control the actions or policies of Via Christi, including the ability to appoint and remove board members.  2006 WL 2773006, at *16.

In Jeanes Hospital, the court held that the Administrator's conclusion that Jeanes Hospital had the ability to significantly influence or direct the actions of policies of the surviving corporation was not supported by substantial evidence: the former board members who transferred to the new entity constituted only a minority of the voting interest and the newly created Jeanes Hospital was controlled by its parent corporation TUHS (which consisted of 12-15 member hospitals) so their voting rights were even further diluted.  453 F. Supp. 2d at 901-02.

In this case, the facts resemble those in Via Christi rather than those in Jeanes Hospital. The predecessor SMMH gained the power to appoint 10 of 16 members of UPMC St. Margaret's board of directors, the president, three vice presidents and the controller of SMMH all carried over to the merged entity and the Merger Agreement provided that the board would exercise

control during the Integration Period. The Secretary's conclusion that the scope of control was "significant" is supported by substantial evidence and is entitled to deference.

Bona Fide Transaction

Plaintiff contends that the Secretary's conclusion that the transaction was not bona fide is not supported by substantial evidence. Defendant responds that substantial evidence in the record supports the Secretary's conclusion.

The PRM states that:

A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest.

PRM, Ch. 1, § 104.24.[11]

The Administrator concluded that:

the Provider is not entitled to a loss on the disposal of assets because the Provider failed to show that there was a *bona fide* sale of its depreciable assets. As stated above a *bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest. As outlined in PM A-00-76, in evaluating whether a *bona fide* sale has occurred with respect to a merger or consolidation between or among nonprofit entities, a comparison of the sale price with the fair market value of the assets acquired is required. A large disparity between the sale price (consideration) and the fair market value of the assets indicates the lack of a *bona fide* sale.

In this case, the record shows that the Provider transferred a combination of cash and current assets with a book value of approximately $86 million and depreciable assets with a net book value of approximately $49 million (for a total of approximately $136 million) in exchange[] for approximately $71 million. Even if the value of the depreciable assets are [sic] not considered, UPMC St. Margaret's assumption of the Provider's debt ("purchase price") was $15 million less than the Provider's current and monetary assets alone. This purchase price

---

[11]     A.R. 892.

cannot be considered reasonable consideration and, thus, the transaction did not constitute a *bona fide* sale.

The fact that the Provider did not secure an appraisal prior to closing date of this transaction is a further indication that the Provider was not concerned with receiving reasonable consideration for its depreciable assets. Further, there is no documentation as to the basis for the Provider's conclusion that the assumption of debt was fair consideration for the Provider's assets. Thus, the Administrator finds that ... the transaction was not a *bona fide* sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

(A.R. 24.)

Defendant notes that courts have consistently found the bona fide transaction provisions applicable in the context of mergers. See Jeanes Hosp., 453 F. Supp. 2d at 903; Via Christi, 2006 WL 2773006, at *16-17.

Plaintiff argues that, in Jeanes Hospital, the Administrator had concluded that a merger was not an arm's-length transaction because the assumption of debt and other payments totaling $69.2 million was insufficient consideration for an asset with a book value of $98.7 million, but the court found this conclusion to be clear error and therefore arbitrary and capricious: "Comparing the consideration received with the net book value flatly contradicts the Medicare statutes." 453 F. Supp. 2d at 904. The court further stated that the Administrator should have compared the consideration with the fair market value of the assets, but since the record was never developed on the issue of fair market value, the case was remanded to the Administrator for further fact finding or other proceedings.

In this case, however, fair market value has been determined. By Plaintiff's calculations, UPMC St. Margaret acquired $86 million in cash or cash equivalent for less than $71 million and, Defendant argues, paid nothing for the hospital buildings and equipment despite their appraised value of $36 million.

The Secretary's conclusion that the transaction was not bona fide is supported by substantial evidence in the record, including Plaintiff's appraisal.  Therefore, it is entitled to deference.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 24) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 5, 2007